IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                          CASE NO. 1:05cr40-SPM

YUNIER LIMA-SUAREZ,
LAZARO ULYSIS DALY,
JUAN J. GOMEZ, and
ROBERT VALLE, et al.,

    Defendants.
_____/

## ORDER DENYING MOTION TO SUPPRESS

Defendant Yunier Lima-Suarez's motion to suppress (doc. 192) was heard on February 15, 2006. In addition to the arguments and testimony presented at the hearing, Lima-Suarez filed a supplemental brief (doc. 209), which the Court has considered.

Lima-Suarez contends that evidence and statements obtained during the search of a house and barn at 1839 Northwest County Road 138, Branford, Gilchrist County, Florida should be suppressed because agents from the Drug Enforcement Agency unlawfully entered the curtilage, thereby tainting the subsequent consent to search. Defendants Roberto Valle, Juan J. Gomez, and Lazaro Ulysis Daly have adopted the motion.

**I.      BACKGROUND**

Testimony at the hearing established that on September 7, 2005, officers from the Drug Enforcement Agency were conducting an investigation of suspected marijuana cultivation in Gilchrist County, Florida.  Earlier in the day, they arrived at another property located at 3290 Southeast County Road 337, Trenton, Gilchrist County, Florida.  They talked to Eduardo Acosta.  Acosta cooperated with the agents and showed them a barn on the property that was used to grow marijuana.  The barn had been wired with electricity for lights and air conditioning, and outfitted with an irrigation system.  Two hundred thirty-nine marijuana plants were growing inside.

Acosta advised the agents that there was a similar grow operation taking place at a property in Branford.  He led the agents to 1839 Northwest County Road 138, Branford, Gilchrist County, Florida.   The agents drove by the property and observed a fence, five to six feet high, that surrounds the perimeter of the 80 acre parcel.  A paved driveway runs from County Road 138 and is secured by a large iron gate.  Acosta advised the agents that a house, not visible from the entry gate, was located 300 to 400 yards down the driveway.  The agents drove Acosta back and returned to the property without him.

Agent Wayne Andrews, who acted as the lead investigator, scaled the perimeter fence first, with three other agents following behind him.  He walked through the property, toward the house.  Initially, Agent Andrews did not walk on the driveway, which from the entry gate is flanked on both sides by a wooden

horse fence.  Lights illuminate the driveway to the house.

Approximately 75 yards from the house, the driveway splits, with one part going to the barn and one part going to the house and continuing to a double wide mobile home.  The wooden horse fence splits with the driveway and continues to form a partial loop that encompasses the house and the mobile home and straddles the barn.  The fenced loop is approximately 3 to 4 acres in size.  Other fences are located throughout the 80 acres and there is a large pump house and an abandoned single wide mobile home on the property.  The layout gave Agent Andrews the impression that at one point the property had been developed as a trailer park.

From the crest of a hill partway down the drive, Agent Andrews could smell flowering marijuana and hear the hum of lighting ballasts.  He could see the driveway lead down toward the house and people walking away from it with a flashlight.  He tried to make contact with the people, but they did not hear him.  Agent Andrews continued walking toward the house and the people.  He climbed over the wooden horse fence and made contact with Lima-Suarez, who was walking and playing with a woman and a young child.  The woman and child were later identified as the wife and child of Juan J. Gomez.  Lima-Suarez had fragments of marijuana leaves on his shirt.

Lima-Suarez spoke in English to Agent Andrews.  His speaking was sometimes slow, but he communicated well.  He told Agent Andrews that he came out to investigate why the dog was barking.  He stated that the owner of

the property was out by the barn.  Agent Andrews waited with Lima-Suarez while the purported owner, Gomez, came over with Lazaro Ulysis Daly.

Agent Andrews greeted them in English, but only Daly responded.  Gomez did not speak English.  By this time, the other agents who were initially with Agent Andrews arrived.  Agent Andrews read Lima-Suarez and Daly their rights in English.

A Spanish speaking agent, Florentino Rosales, was called from the Trenton location to communicate with Gomez.  In the time it took Agent Rosales to arrive, Agent Andrews talked with Lima-Suarez and Daly.  Lima-Suarez told Agent Andrews that he came to Branford to make money and had arrived earlier in the day by bus.  Gomez picked him up at the station.   When Agent Andrews confronted Lima-Suarez about the marijuana on his shirt, Lima-Suarez said he needed to make some money.  Daly just shook his head.

Lima-Suarez consented to allow Agent Andrews to look through his belongings in the mobile home, where Lima-Suarez was staying with Daly.  When Agent Andrews asked Lima-Suarez what he would find in the mobile home, Lima-Suarez responded that he would only find a bag with clothes for himself.  In the mobile home, Agent Andrews found a bag with clothes for Lima-Suarez and another bag with clothes for Daly.  Agent Andrews did not look inside the bags.  It was apparent that only Lima-Suarez and Daly were staying in the mobile home.  Gomez and his wife and child were staying in the house, which was approximately 60 yards away.

Page 5 of 12

Back outside, Gomez, through Lima-Suarez, asked Agent Andrews for permission to get a drink of water inside the house. When Agent Andrews inquired about the availability of an outdoor spigot, Gomez told Agent Andrews through Lima-Suarez that the water was bad and that he had purified water inside.

Agent Andrews allowed Gomez to get water so long as Agent Andrews could go with him. Gomez consented. Inside, Agent Andrews smelled marijuana and saw marijuana through the open door of what appeared to be a processing room.

When Gomez returned outside, he spoke to his wife and then to Lima-Suarez. Through Lima-Suarez, Gomez asked Agent Andrews if they could all wait inside in the living room while they waited for Agent Rosales to arrive. Agent Andrews assented with the condition that the agents search the immediate area for security purposes. Gomez consented.

Once situated in the living room, Mrs. Gomez and the child were allowed to use the restroom. At the request of Gomez, the door to the processing room was closed so that his child would not see the marijuana and go to play in it. Later while the search of the property was taking place, Mrs. Gomez bathed the child and turned on the television for the child to watch cartoons. Mrs. Gomez also fixed dinner. Lima-Suarez and Daly ate dinner with the Gomezes. Afterward, Mrs. Gomez and the child went to sleep.

When Agent Rosales arrived, he spoke to Gomez outside. Agent Rosales

read Gomez his rights in Spanish and asked Gomez if he understood. Without hesitation Gomez said yes. Agent Rosales asked Gomez for consent to search the residences, barn, and vehicles. Gomez consented. His consent was memorialized on a pre-printed consent form written in Spanish.

Once Gomez signed the written consent form, Agent Rosales asked Gomez if there were any weapons or money in the house. Gomez led agents into the house and showed them a firearm and money. When Agent Rosales asked Gomez to show him the marijuana, Gomez motioned for the agents to follow him out to the barn, which was located 30 to 50 yards from the house. Gomez took keys out of his pocket and unlocked the door.

Inside the barn was a professional grow operation similar to the operation at the Trenton property. The barn contained approximately 200 live plants. It also contained 10 harvested root bases, the tops of which were being processed in the house.

After searching the barn, Gomez and Agent Rosales returned to the house. Agent Rosales again talked to Gomez about his rights. This time, Agent Rosales copied the rights in longhand from a DEA form. Gomez acknowledged that he understood all of his rights by placing his initials on each line and signing the written statement of rights. Gomez told Agent Rosales that he was worried about his wife and child, and that his wife had nothing to do with the operation.

At the final paragraph, which asks for consent to answer questions, Gomez hesitated. Agent Rosales told Gomez that he could get an attorney.

Page 7 of 12

Gomez decided that he wanted to talk to an attorney before answering any more questions. Daly and Lima-Suarez also invoked their right to counsel. From that time on, the agents did not question Gomez, Daly, or Lima-Suarez. Roberto Valle, who is the owner of the property, was not present while the agents were there.

## II.   DISCUSSION

### A.   Standing

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Alderman v. United States, 394 U.S. 165, 174 (1969). With respect to a third person's premises, a person's standing to challenge a search will depend on whether the person has a reasonable expectation of privacy in the premises, that is an expectation of privacy that society is prepared to recognize. Minnesota v. Olson, 495 U.S. 91, 97-98 (1990).

An overnight guest has a recognized expectation of privacy on a third party's premises, which is sufficient to confer standing to challenge a search of the premises. Id. at 96-97. "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host will allow inside." Id. at 99. These expectations are shared and valued by society, and therefore recognized under the Fourth Amendment. Id. at

98.

In contrast, a person at location on a third person's premises solely for a business transaction does not have a reasonable expectation of privacy in the premises and no standing to challenge a search. <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998). Factors such as the "commercial nature of the transaction, the relatively short period of time on the premises, and the lack of any previous connection between the [person] and the householder" all lead to a diminished connection to the premises and a diminished expectation of privacy. <u>Id.</u> at 91.

In this case, the Government does not contest standing to challenge the search on the part of Gomez, who was living in the house, and Defendant Roberto Valle, who actually owns the property. With respect to Lima-Suarez and Daly, however, the Government contends that they have no standing to challenge the search of the house and barn because they were staying in the mobile home and were there for business purposes.

According to statements made by Lima-Suarez and observations made by Agent Andrews, neither Lima-Suarez nor Daly were overnight guests staying in the house. From all indication, they had recently arrived from out of town for the sole purpose of working on the property. Their belongs were placed in the mobile home, away from the house and barn.

There was no evidence of a previous social connection between Lima-Suarez and Daly and the other defendants. From all indication, Lima-Suarez and

Daly were workers expecting payment for services, as opposed to social guests. They may have had a legitimate expectation of privacy in their temporary living quarters in the mobile home. With respect to the house and barn, however, given the purely commercial reason for their presence, the relatively short period of time on the premises, and the lack of a connection to the householders, Lima-Suarez and Daly did not suffer a violation of any rights personal to them through the search of the house and barn. Accordingly, they have no standing to challenge the search.

### B.    Curtilage

Curtilage is the area around the home that "harbors those intimate activities associated with domestic life and the privacies of home." United States v. Dunn, 480 U.S. 294, 300 (1987). This is in contrast to "open fields," which are regarded for Fourth Amendment purposes as tantamount to public places. Id. Open fields include undeveloped or unoccupied areas outside of the curtilage, even if those areas are neither open nor fields as those terms are commonly understood. Id.

Curtilage is not defined by the property line. Id. at 301. Nor is the existence of fencing alone determinative of curtilage. Id. Instead curtilage is defined by reference to four factors that reflect upon whether an individual reasonably may expect the area to be treated as an extension of the home. Id. at 301 n. 4. The four factors are: (1) the proximity of the area to the house, (2)

whether the area is within an enclosure surrounding the house, (3) the use of the area, and (4) the steps taken to protect the area from observation by the public. Id. at 301.  Applying these four factors to property at issue, it is apparent that Agent Andrews did not unlawfully intrude upon the curtilage.

First, the area where Agent Andrews initially met with Lima-Suarez was a good distance away from the house, approximately 50 yards.  Second, although Agent Andrews crossed an interior horse fence to reach Lima-Suarez, from the layout of the fence along the driveway, it is likely that the fence was used to keep horses in the surrounding pastures and away from the driveway and house.  The fence was not a privacy fence and did not present a formidable barrier.  Third, the driveway area is not an area where intimate activities of the home take place.  The driveway is one of the more public areas of the property and provides the principal means for access to the house from the street.  Finally, although visibility to the area is blocked from the street by a hill, the area was readily visible from the open fields on the property.

Based on the foregoing, the Court concludes that Agent Andrews did not unlawfully intrude upon the curtilage of the house.  There is, therefore, no unlawful taint for the Government to overcome in establishing Gomez's consent to the search of the house and barn.

### C. Consent

As a general rule, a search warrant is required before the Government can

search a person's house. There are, however, certain exceptions. Consent to search is one of them. A valid search of a house may be made without a search warrant and without probable cause if the person in control thereof has given consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

To effectuate a valid consent, it is not required for an individual giving consent to be advised of the right to withhold consent. Id. at 231-33. Nor is it required that consent be an intentional relinquishment of a known right or privilege, as is the case with waiver of some constitutional rights. Id. at 243-45. What is required is that the consent be voluntary, that is free from coercion. Id. at 227-28. The voluntariness of consent is determined by "analyzing all the circumstances of an individual consent . . . , [and by] careful sifting of the unique facts and circumstances of each case. . . ." Id. at 233.

Some factors to consider are whether the defendant was free to leave, the existence of coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse consent, the ability of the defendant to refuse consent, and the extent of the defendant's education and intelligence. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002). Consideration of these factors in the instant case shows that Gomez's consent to search was freely and voluntarily given.

First, although Gomez was not free to leave the property, he was not placed in handcuffs. He was allowed to move freely in the living room. Second,

the police did not engage in coercive behavior. Only five agents were on the scene and they were cordial to the Gomezes, Lima-Suarez, and Daly. They allowed Mrs. Gomez to cook dinner and tend to the child. Third, Gomez was very cooperative throughout the search and showed the officers his weapon, the money, and the barn. Fourth, Gomez was advised of his rights by Agent Rosales and given the opportunity to refuse consent. Finally, there is no indication that Gomez has low intelligence or was otherwise unable to understand his rights.

### D.     Conclusion

Gomez and Valle have standing to challenge the search of the house and barn. Agent Andrews did not unlawfully enter the curtilage when he met Lima-Suarez near the driveway. The subsequent consent by Gomez for the search of the barn and house was freely and voluntarily given. Based on the foregoing, it is

ORDERED AND ADJUDGED that the motion to suppress (doc. 192) by Lima-Suarez and adopted by Valle, Gomez, and Daly, is denied.

DONE AND ORDERED this 23nd day of March, 2006.

*s/ Stephan P. Mickle*
Stephan P. Mickle
United States District Judge